CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAY - 9 2008

JOHN F. CORCORAN, CLERK
BY: _____
     DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | |
|---|---|
| ROY A. DYE, ) | |
| Plaintiff, ) | Civil Action No. 2:07cv00034 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| MICHAEL J. ASTRUE, ) | BY: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. ) | |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

## I. Background and Standard of Review

The plaintiff, Roy A. Dye, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Dye's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 2:07-cv-00034-GMW-PMS   Document 16   Filed 05/09/08   Page 1 of 33   Pageid#: 52

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Dye protectively filed applications for DIB and SSI on July 5, 2000,[1] alleging disability as of June 26, 1998,[2] due to back and leg pain. (Record, ("R."), at 62, 77, 261.)[3] The claims were denied initially and on reconsideration. (R. at 48-59.) Dye then timely requested a hearing before an administrative law judge, ("ALJ"). (R. at 60.) The ALJ held a hearing on July 24, 2001, at which Dye was represented by counsel. (R. at 25-36.)

By decision dated August 15, 2001, the ALJ denied Dye's claims. (R. at 10-

---

[1] Dye's SSI application is not included within the record, as pages 121-36 are missing from the administrative file.

[2] Dye's original alleged onset date was April 14, 1994. However, the onset date was amended at some point prior to the most recent ALJ decision.

[3] Dye filed previous applications for benefits on March 31, 1997, and April 23, 1997, which were denied initially and upon reconsideration. (R. at 45, 47, 262.) A hearing was held before an administrative law judge, and, by decision dated June 25, 1998, the administrative law judge denied Dye's claims. (R. at 262.) The decision was affirmed by both the Appeals Council and this court. (R. at 262.) Thus, that particular decision is not currently before the court, as Dye alleges an onset date subsequent to the date of that decision. (R. at 262.)

Case 2:07-cv-00034-GMW-PMS  Document 16  Filed 05/09/08  Page 2 of 33  Pageid#: 53

17.) Dye then requested a review of the ALJ's decision; however, on August 23, 2001, that request was denied by the Appeals Council. (R. at 5-7.) On appeal to this court, Dye's case was remanded on April 9, 2003, for further consideration pursuant to the fourth sentence of 42 U.S.C. § 405(g). (R. at 175-78.) On remand, by decision dated August 13, 2003, Dye's claims were once again denied by the Commissioner. (R. at 156-66.) Dye sought reconsideration of the ALJ's unfavorable decision. (R. at 154.) Thereafter, on July 3, 2004, Dye's request for reconsideration was denied; thus, the ALJ's August 13, 2003, decision became the final decision of the Commissioner. (R. at 137-39.) Dye then appealed the decision to this court for a second time. On March 22, 2006, this court remanded the case to the Commissioner for further consideration pursuant to the fourth sentence of 42 U.S.C. § 405(g). (R. at 268.) After the second remand by this court, a hearing was held before another ALJ on September 5, 2006, at which Dye was represented by counsel. (R. at 320-38.)

By decision dated September 18, 2006, the ALJ denied Dye's claims. (R. at 261-67.) The ALJ found that Dye met the disability insured status requirements of the Act for DIB purposes through December 31, 1999, but not thereafter. (R. at 266.) The ALJ found that Dye had not engaged in substantial gainful activity since June 28, 1998. (R. at 266.) In addition, the ALJ determined that Dye had combined impairments that were severe, but he found that Dye did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 266.) Furthermore, the ALJ found that Dye's allegations of disabling pain and other symptoms were credible, as they related to the period beginning February 4, 2003, but not prior to that date. (R. at 266.) The ALJ determined that, at all times relevant to his decision, Dye possessed the residual

Case 2:07-cv-00034-GMW-PMS   Document 16   Filed 05/09/08   Page 3 of 33   Pageid#: 54

functional capacity to perform light work[4] that did not require overhead reaching or work at unprotected heights and around dangerous machinery. (R. at 266.) The ALJ also determined that Dye was limited to simple, unskilled jobs. (R. at 266.) Therefore, the ALJ found that Dye was not capable of performing his past relevant work as a general laborer in the coal mines. (R. at 266.) Moreover, the ALJ found that prior to February 4, 2003, Dye was classified as an individual closely approaching advanced age, and as of February 4, 2003, Dye attained the age of 55, which classified him as advanced age. (R. at 266.) The ALJ noted that Dye had a limited education, and that he did not possess any acquired work skills that were transferrable to the skilled or semiskilled work activities of other work. (R. at 266.) The ALJ concluded that, considering Dye's residual functional capacity, age, education and work experience, he was not disabled prior to February 4, 2003, and that there were jobs within the regional and national economies that Dye was capable of performing prior to February 4, 2003, such as a general laborer, a hand packer, a sorter, an assembler and a food service worker. (R. at 267.) Additionally, the ALJ found that, considering Dye's residual functional capacity, age, education and work experience, he was disabled as of February 4, 2003. (R. at 267.) Thus, the ALJ concluded that Dye has been under a disability as defined in the Act since February 4, 2003, but not prior thereto. (R. at 267.)

After the ALJ issued his decision, Dye pursued his administrative appeals and sought review of the ALJ's decision by the Appeals Council. However, on May 21,

---

[4]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

-4-

2007, the Appeals Council denied Dye's request for review; thereby making the ALJ's decision the final decision of the Commissioner. (R. at 247-50.) *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). Thereafter, Dye filed this action seeking review of the ALJ's unfavorable decision. The case is currently before the court on Dye's motion for summary judgment, which was filed on December 21, 2007, and the Commissioner's motion for summary judgment, which was filed on February 19, 2008.

## *II. Facts*[5]

Dye was born in 1948; thus, at the time he filed for DIB and SSI, he was considered a "person closely approaching advanced age." *See* 20 C.F.R. §§ 404.1563(d), 416.963(d) (2007). As of February 4, 2003, when Dye reached the age of 55, he was classified as a "person of advanced age." *See* 20 C.F.R. §§ 404.1563(e), 416.963(e) (2007). According to the record, Dye has a seventh grade education, (R. at 83, 323), which qualifies as a "limited education." *See* 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3) (2007). Dye's past relevant work was as a general laborer in the coal mines. (R. at 323.)

At the hearing before the ALJ on September 5, 2006, the ALJ pointed out that because Dye was insured for DIB purposes through December 31, 1999, the ALJ must find that he was disabled on or before that date in order for Dye to be eligible for DIB benefits. (R. at 323.) Dye testified that, at the time of the hearing, he was 58

---

[5]The relevant facts summarized in the opinion begin subsequent to the claimant's alleged onset date of June 26, 1998.

-5-

years old and that he had not been employed since 1994. (R. at 323.) Dye indicated that he worked a total of 22 years in the coal mines. (R. at 323.) Dye's counsel asked him to describe the problems he experienced on or before December 31, 1999, that prevented him from performing work. (R. at 324.) Dye testified that he had broken his left femur, which required the insertion of a rod, and that he suffered from back and shoulder problems.[6] (R. at 324.) Dye explained that his left femur was broken in 1991 in a mining accident, and that the injury caused him to be out of work for six months. (R. at 324-25.) He further explained that following the six-month period, he returned to work until 1994. (R. at 325.) However, Dye noted that he did not return to his past work; instead, he was assigned jobs with limited activity such as watching the mining belt. (R. at 325.) Dye acknowledged that his employer made accommodations for his injury. (R. at 325.)

Dye testified that the process of inserting a rod into his leg caused left leg weakness. (R. at 325.) He stated that he could not walk for extended periods. (R. at 326.) Dye estimated that he could stay on his feet for about one hour at a time, and that he could walk for "maybe a half hour or less" at a time. (R. at 326.) In addition, Dye testified that he could lift and/or carry items weighing no more than 10 pounds, and that he was unable to squat. (R. at 326.) Dye also testified that he experienced difficulties due to herniated discs, which he alleged caused constant lower back pain. (R. at 326.) He stated that, as of 1999, he experienced problems with both shoulders, especially his left shoulder. (R. at 326.) Dye indicated that the pain caused him to

---

[6]In the transcript of the hearing, it states that Dye's "left finger" had been broken. (R. at 324.) However, based upon a review of the record, it is apparent that the hearing transcript contains a typographical error and should have read "left femur."

Case 2:07-cv-00034-GMW-PMS Document 16 Filed 05/09/08 Page 6 of 33 PageID#: 57

be unable to move his arms, and that he experienced difficulties lifting and raising his hands above his head. (R. at 327.) Dye testified that during this time period, he was prescribed blood pressure medication, which he stated controlled his blood pressure. (R. at 328.) Dye testified that pain and other problems had an emotional impact on him. (R. at 328.) Dye explained that the pain caused him to be depressed because he could not longer perform activities that he was once able to perform. (R. at 328.) He further testified that he experienced sleep difficulties and was unable to maintain focus because of his pain. (R. at 328.)

Dye indicated that he had a valid driver's license, but stated that he participated in no hobbies or social activities outside the home. (R. at 329.) He explained that he spent his time "fiddling around in the house and around in the yard." (R. at 330.) He testified that he mowed the yard and helped his wife take care of the house. (R. at 330.) He stated that he helped vacuum and cook, but explained that he could not do that type of work for a complete day. (R. at 330.) Dye testified that he could vacuum for about 30 minutes and then he was forced to sit down and rest. (R. at 330.) Dye also testified that, as of 1999, he took Novocaine and pain killers to treat his pain. (R. at 331.) He stated that his pain did not cause him to make any changes with regard to his daily activities, but explained that he did "very little" throughout a typical day. (R. at 331.) Dye further stated that he was instructed to elevate his legs daily, and that he usually elevated his legs for approximately 30 minutes each day. (R. at 331.)

In response to questions posed by the ALJ, Dye testified that he was right-handed and that no surgeries had been performed on his shoulders. (R. at 332.) Dye also indicated that no doctor had recommended surgery. (R. at 332.) Dye explained

-7-

that he complained of shoulder problems consistently, but that no one had actually ever treated his shoulders. (R. at 333.) He stated that when he began physical therapy on his legs, he also began therapy on his shoulders. (R. at 333.) Dye acknowledged that he last worked in April 1994, when he was laid off from his employment as a coal miner. (R. at 333.)

Donna Bardsley, a vocational expert, also was present and testified at Dye's hearing. (R. at 334-37.) Bardsley identified Dye's past relevant work as a coal miner as heavy,[7] unskilled work. (R. at 334.) Due to the fact that Dye's past work was identified as unskilled, Bardsley explained that Dye would have no skills that would be transferable to either light or sedentary[8] work. (R. at 334.) The ALJ asked Bardsley to assume a hypothetical individual between the ages of 50 and 58, based upon Dye's alleged onset date to the current date, with the same education and work experience as Dye, who would be limited to medium[9] work that did not require overhead reaching, and would be limited to simple, unskilled jobs that would not require work around unprotected heights, dangerous equipment or machinery. (R. at 335.) Based upon those restrictions, Bardsley opined that there would be a significant

---

[7]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* C.F.R. §§ 404.1567(d), 416.967(d) (2007).

[8]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* C.F.R. §§ 404.1567(a), 416.967(a) (2007).

[9] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he also can do light work or sedentary work. *See* 20 C.F.R. § 404.1567(c), 416.967(c) (2007).

-8-

number of jobs available within the regional and national economies for such an individual, including jobs as a general laborer, a hand packager, a sorter, an assembler and an inspector. (R. at 335.)

The ALJ posed a second hypothetical and asked Bardsley to assume a hypothetical individual between the ages of 50 and 55, with the same education and prior work experience as Dye, who would be limited to light work with no overhead reaching, and who was limited to simple, unskilled jobs that would not require work around dangerous equipment or machinery. (R. at 335-36.) Bardsley indicated that there would be ample jobs within the regional and national economies for such an individual, including jobs in food service related occupations, and jobs such as a general laborer, a hand packager, a sorter and an assembler. (R. at 336.) Bardsley indicated that her testimony was consistent with the Dictionary of Occupational Titles. (R. at 336.)

Dye's counsel asked Bardsley if there would be any occupations available if the hypothetical individual possessed the restrictions set forth in Exhibits B10F and B9F,[10] to which Bardsley responded negatively. (R. at 336.) Dye's counsel also asked Bardsley if a hypothetical individual presented the same testimony as Dye, and that testimony was considered credible as to his limitations, whether there would be any jobs available in the regional or national economies for such an individual. (R. at 336.) Bardsley opined that no jobs would be available. (R. at 337.)

_____

[10]Exhibits B9F and B10F are separate Medical Assessment Of Ability To Do Work-Related Activities (Physical) forms, which were completed by Dr. Robert Walker, M.D., on July 15, 2002, and December 15, 2003, respectively. (R. at 149-51, 220-23.) Dr. Walker reported identical findings in each assessment. (R. at 149-51, 220-23.)

Case 2:07-cv-00034-GMW-PMS   Document 16   Filed 05/09/08   Page 9 of 33   PageID#: 60

In rendering his decision, the ALJ reviewed records from Dr. Samina Yousuf, M.D.; Dr. Robert Walker, M.D.; Highlands Internal Medicine; Dr. Roger D. Neal, M.D.; Dr. G.S. Kanwal, M.D.; Johnston Memorial Hospital; Kathy J. Miller, M.Ed., a state agency psychologist; Robert Spangler, Ed.D, a state agency psychologist; Dr. Robert O. McGuffin, M.D., a state agency physician; and Dr. Randall Hays, M.D., a state agency physician.

On September 28, 2000, Dr. Samina Yousuf, M.D., performed a consultative examination on Dye. (R. at 100-06.) Dr. Yousuf noted that Dye had sustained two previous coal mining injuries in 1979 and 1991, which Dye alleged caused severe low back pain that worsened in the mornings. (R. at 100.) Dye also reported that he experienced constant pain, especially when he walked. (R. at 100.) Dr. Yousuf observed a deformed left suprascapular region, which Dye stated had been present since his 1991 injury, which resulted in a broken femur. (R. at 100.) Dye indicated that he had brought the deformity to the attention of various doctors, but no action had been taken. (R. at 100.) Dr. Yousuf noted a past medical history of hypertension, left femur fracture, status post fixation and a herniated disc in his lower back. (R. at 100.) Dr. Yousuf reported questionable dislocation in the left shoulder, with left shoulder stiffness and a limited range of motion. (R. at 100.) Dr. Yousuf also reported depression, peptic ulcer disease and a questionable history of pneumoconiosis, and explained that Dye was undergoing a work-up for pneumoconiosis at the time of the examination. (R. at 100.)

Dr. Yousuf observed positive signs of insomnia, depression and severe low

-10-

back pain caused by minimal activity. (R. at 101.) Dye indicated that he suffered from constant left shoulder pain and an examination revealed that he could not extend or abduct his left shoulder. (R. at 101.) Dr. Yousuf noted diminished strength in Dye's left hand. (R. at 101.) Dye complained of urinary frequency and a slow urinary stream, but reported no complaints of abdominal pain, nausea, vomiting, diarrhea, constipation or headaches. (R. at 101.) Dr. Yousuf found Dye's memory to be "okay," as he was able to recall three out of three. (R. at 101.) Dye complained of constant back pain and claimed if he sat for more than 30 minutes, the pain worsened and he was forced to get up and walk. (R. at 101.) Dye explained that he sometimes constantly hurts for two to three days with unbearable pain. (R. at 101.) Dye denied any numbness in his upper or lower extremities. (R. at 101.) Dye explained that he could not climb stairs due to his back and left thigh pain and indicated that he could only drive for short distances, i.e. less than 15 to 20 minutes. (R. at 101.)

Upon examination, Dye was observed to be cooperative, but depressed and in pain. (R. at 101.) The examination revealed a very prominent scapula, as well as a hump and limited range of motion in the left shoulder. (R. at 102.) Although the majority of the range of motion assessment was within normal range, Dye's flexion in the dorsolumbar spine was below normal at 70 degrees and his extension also was below normal at 20 degrees. (R. at 104.) In addition, Dye's left shoulder abduction, forward elevation, internal rotation and external rotation were all below normal. (R. at 104.) Dr. Yousuf reported diminished motor strength in Dye's left upper extremity. (R. at 102.) Dye was alert and oriented, his memory was intact and his motor strength was 5/5, except for his left upper extremity extensors, flexors, hand muscles and

-11-

deltoid. (R. at 102.) Weakness and mild atrophy in his left arm was visible when compared to his right side. (R. at 102.) Tenderness to palpation was reported in the left suprascapular region, as well as the left shoulder posteriorly. (R. at 102.) No point spinal tenderness was noted. (R. at 102.) Dr. Yousuf observed moderate low back tenderness in the lumbosacral, ("LS"), region and paraspinal muscle stiffness on the right side of the LS spine. (R. at 102.) Dye's reflexes were 2+ and his sensory was intact. (R. at 102.) In Dr. Yousuf's assessment, he reported low back pain as a result of previous injuries that limited Dye in his "ability to do anything." (R. at 103.) In addition, moderate pain was noted in the left shoulder. (R. at 103.)

An x-ray of the lumbar spine, ordered by Dr. Yousuf during this consultative examination, showed the vertebral body heights and disc spaces to be normally maintained, with some minimal anterior lateral spurring at the anterior superior aspect of L4. (R. at 106.) Dye's posterior elements appeared to be intact and the articulation of L5 on S1 was normal with no evidence of spondylolisthesis. (R. at 106.) The x-ray revealed no acute osseous abnormality or evidence of prior osseous trauma. (R. at 106.)

On October 17, 2000, Dr. Robert O. McGuffin, M.D., a state agency physician, performed a Physical Residual Functional Capacity Assessment, ("PRFC"). (R. at 107-14.) Dr. McGuffin determined that Dye was able to occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds, stand and/or walk for a total of about six hours and sit for a total of about six hours in a typical eight-hour workday. (R. at 108.) Dr. McGuffin also found that Dye was unlimited in his ability to push and/or pull. (R. at 108.) Additionally, Dr.

-12-

McGuffin found that Dye could frequently balance, kneel, crouch, crawl and climb stairs, could occasionally stoop and could never climb a ladder. (R. at 109.) Although Dr. McGuffin found that Dye was unlimited in his ability to reach, handle, finger and feel with his right arm, he determined that Dye was limited in his ability to reach in all directions with his left arm. (R. at 110.) No visual, communicative or environmental limitations were noted. (R. at 110-11.) Based upon the medical records, Dr. McGuffin found Dye's allegations to be only partially credible. (R. at 112.) Dr. McGuffin's findings were affirmed by Dr. Randall Hays, M.D., a state agency physician, on November 30, 2000. (R. at 114.)

Dr. Robert Walker, M.D., treated Dye from June 28, 2001, through January 3, 2006. (R. at 141-51, 187-204, 304-19.) On June 28, 2001, during a complete check-up examination, Dye reported that he had been relatively healthy most of his life. (R. at 194.) Dr. Walker diagnosed Dye with hypertension, probable benign prostatic hyperplasia, ("BPH"), palpitations, status post left femur fracture, left shoulder bursitis, a history of lumbosacral spine disc disease and status post burns to face and hands. (R. at 195.) An electrocardiogram, ("EKG"), revealed no arrhythmia, and Dye was discontinued from Prinivil. (R. at 195.) Dye was instructed to return in six months. (R. at 195.) Dr. Walker examined Dye again in December 2001, and he noted that Dye was "having no symptoms whatsoever." (R. at 193.) However, Dye reported that he suffered headaches a few months prior to this visit. (R. at 193.) Dye also reported an elevated blood pressure, but noted that he had not been taking Prinivil to treat it; but, once he was restarted on the medication, his blood pressure was controlled and his headaches ceased. (R. at 193.) Dye's cardiac, pulmonary and gastrointestinal system review was normal. (R. at 193.) Dye was assessed with

-13-

hypertension and BPH. (R. at 193.) Dye was instructed to continue his current medications. (R. at 193.)

Dye presented for a follow-up appointment in June 2002 in relation to a hospitalization at Johnston Memorial Hospital for chest pain. (R. at 192.) Dr. Walker noted that a heart attack had been ruled out during that admission and that Dye's Cardiolite Thallium stress test did not reveal ischemia. (R. at 192.) Dr. Walker also noted that since Dye's discharge from the hospital, his Prinivil dosage had been increased. (R. at 192.) Dr. Walker reported that Dye was "doing well" with "no chest pain, no dyspnea, and no abdominal symptoms." (R. at 192.) Dr. Walker diagnosed Dye with atypical chest pain, hypertension and probable gastroesophageal reflux disease, ("GERD"). (R. at 192.) He was advised to follow up in six months. (R. at 192.)

On July 15, 2002, Dr. Walker completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical).[11] (R. at 221-23.) Dr. Walker determined that Dye's ability to lift and/or carry items was affected by his impairments. (R. at 221.) Dr. Walker found that Dye could lift and/or carry items weighing up to five pounds occasionally, which was identified as "from very little up to 1/3 of an 8-hour day." (R. at 221.) In addition, Dr. Walker found that Dye was capable of lifting and/or carrying items weighing up to one pound frequently. (R. at 221.) Dr. Walker also determined that Dye could only stand and/or walk for a total of one hour in a typical

---

[11]Dr. Walker also performed a Medical Assessment Of Ability To Do Work-Related Activities (Physical) on December 15, 2003, in which his findings were identical to his July 2002 assessment. (R. at 149-51.)

-14-

eight-hour workday, and that he could only stand and/or walk for a total of 10 minutes without interruption. (R. at 221.) Furthermore, Dr. Walker reported that Dye could sit for a total of two hours in a typical eight-hour workday, but that he could do so for only 15 minutes without interruption. (R. at 222.) Dr. Walker found that Dye could never climb, stoop, kneel, balance, crouch or crawl, and that his ability to reach, handle and push/pull were affected by his impairments. (R. at 222.) According to Dr. Walker, Dye's ability to feel, see, hear and speak were not impacted by his impairments. (R. at 222.) Dr. Walker noted no environmental limitations. (R. at 223.) Dr. Walker concluded that these limitations were supported by the medical findings related to Dye's arm and back pain. (R. at 221-23.)

Dye presented in July 2002 for a follow-up appointment regarding his low back discomfort. (R. at 191.) Dr. Walker noted that Dye requested that several disability forms be completed. (R. at 191.) On December 16, 2002, Dye presented for another follow-up appointment regarding his hypertension. (R. at 190.) A thyroid scan revealed a nodule and Dye explained that he had experienced difficulties swallowing. (R. at 190.) Dr. Walker assessed Dye with hypertension, questionable right thyroid nodule and GERD. (R. at 190.) A June 16, 2003, examination indicated that Dye was doing well, with no significant symptoms. (R. at 188.) Dye was assessed with hypertension, a questionable thyroid nodule and an unhealing lesion on the right posterior neck. (R. at 188.)

On July 22, 2003, Dye presented to Dr. Walker and a basal cell carcinoma, ("BCC"), was removed from his left thigh. (R. at 144.) Probable BCCs were observed on the left side of the nose and on the right neck. (R. at 144.) Dr. Walker

-15-

recommended that a shave biopsy be conducted on each lesion and scheduled a 30-minute surgical excision for at least one of the lesions to be performed during a follow-up visit. (R. at 144.) Dr. Walker also reported that Dye had an occasional lentigo and the scalp, face, eyelids, lips, neck, chest, abdomen, back, arms, fingers and nails were evaluated; however, no further treatment was necessary. (R. at 144.) On August 7, 2003, Dye presented to have a BCC on the right neck removed. (R. at 144.) After the procedure was performed, Dye was advised to follow up in seven days to have the suture removed. (R. at 144.) Dye presented on August 13, 2003, to have the BCC removed from the left side of his nose, which required a two-day surgical excision. (R. at 143.) Dye returned on August 14, 2003, and had the sutures from the first procedure removed. (R. at 143-44.) On August 21, 2003, Dye reported for a follow-up appointment, had the sutures removed from his nose and denied any difficulties at the site of the excisions. (R. at 142.) Dye presented on December 15, 2003, for a six-month check-up and reported no complaints. (R. at 146-47.) A physical examination was unremarkable. (R. at 147.) A basic metabolic panel, ("BMP"), was ordered to examine Dye's hypertension in conjunction with his current dose of Prinivil. (R. at 147.) Dye was advised to monitor his blood pressure and to return in six months. (R. at 147.)

On June 22, 2004, Dye presented to Dr. Walker for a complete check-up. (R. at 310.) Dye reported no complaints, and Dr. Walker noted that Dye was "doing well." (R. at 310.) However, after further questioning, Dye acknowledged that he experienced nocturia, or frequent nighttime urination, but he denied any daytime symptoms. (R. at 310.) Dye also reported a history of rectal bleeding that occurred as a result of an electrical injury, but indicated that he had no problems since that

-16-

time. (R. at 310.) A physical examination was rather unremarkable, but a moderately enlarged prostate was noted. (R. at 310.) Dye was advised to continue on Prinivil to treat his hypertension and was advised to follow up in six months. (R. at 310.) Dye presented on December 27, 2004, with no new complaints and was instructed to continue Prinivil to treat his hypertension and to return in six months for an examination. (R. at 308.)

Dye returned on June 27, 2005, for a complete check-up and physical. (R. at 307.) Dr. Walker noted that Dye had no complaints of any significant nature, but Dye once again reported nocturia, as well as some urinary hesitancy and dribbling. (R. at 307.) Upon examination, Dr. Walker reported a slightly enlarged prostate. (R. at 307.) Dye was prescribed Flomax to treat his urinary symptoms and his Prinivil dosage was increased. (R. at 307.) On September 15, 2005, Dye presented and complained of pain in his right lower lung and right upper quadrant, which he indicated had lasted for approximately two months. (R. at 305.) Dye remarked that the pain was constant, but that it worsened when he laid on his back. (R. at 305.) Upon examination, Dr. Walker observed no soreness in the right upper quadrant area, the right lower lung area in the costal margin or the abdominal region. (R. at 305.) Dr. Walker diagnosed Dye with right lower costal margin and right upper quadrant discomfort and ordered a chest x-ray. (R. at 305.) The chest x-ray revealed normal findings, as Dye's lungs were clear, and his contour, cardiac size and pulmonary vascularity were normal. (R. at 311.)

Dr. Roger D. Neal treated Dye from September 6, 2001, through March 27, 2003, due to trouble swallowing foods, high frequency hearing loss bilaterally and

a thyroid nodule. (R. at 205-07.)

Dye was treated by Dr. G.S. Kanwal, M.D., from November 14, 2001, through November 16, 2001, due to left leg pain and left shoulder pain.[12] (R. at 209-13.) Dr. Kanwal ordered x-rays of the chest, left shoulder and lumbar spine. (R. at 213.) The chest x-ray revealed no significant cardiopulmonary disease, and the x-rays of the left shoulder and lumbar spine showed no significant abnormalities. (R. at 213.)

Dye received treatment at Johnston Memorial Hospital from May 31, 2002, through June 11, 2002, and complained of chest pain and a history of hypertension. (R. at 214-19.) Nuclear cardiology testing revealed a hypertensive response to exercise, but no ischemia was noted. (R. at 218-19.)

On May 17, 2006, Dye was examined by Kathy J. Miller, M.Ed., Licensed Psychological Examiner. (R. at 296-300.) Miller noted that Dye attributed his disability to a mining accident in which he suffered a broken left femur and shoulder injuries. (R. at 296-97.) Dye reported that he sometimes experienced depression due to "everything that's happened" to him. (R. at 297.) Dye denied any suicidal or homicidal ideations. (R. at 297.) At the time of this examination, Dye had never presented to a mental health center, had not been psychiatrically hospitalized and had not been prescribed medication to treat any mental health problems. (R. at 297.) Dye explained that he experienced "low mood[s]" several times per week, and that the mood lasted all day at times. (R. at 297.) Dye further explained that the moods caused him to be quiet and withdrawn, but not irritable. (R. at 297.) He also reported

---

[12]The medical records on pages 211-12 are largely illegible.

Case 2:07-cv-00034-GMW-PMS   Document 16   Filed 05/09/08   Page 18 of 33   Pageid#: 69

periodic sleep difficulties. (R. at 297.) Dye informed Miller that he got along well with others and that he maintained a good appetite. (R. at 297.) Miller noted that Dye was alert and oriented, and that he was pleasant throughout the evaluation. (R. at 297.) Miller observed no vegetative symptoms of depression or anxiety. (R. at 297.) She opined that Dye appeared to be a person of average intelligence who was emotionally stable. (R. at 297-98.)

When asked to describe his activities of daily living, Dye explained that he and his wife cared for their infant granddaughter, and that he and his wife also shared in the care of the child, as well as housework and laundry. (R. at 298.) He further explained that he and his wife shopped for groceries once a week. (R. at 298.) Dye stated that, prior to his injury, he used to hunt and fish, but he has been unable to do so since his leg injury. (R. at 298.) Dye noted that his hobby was "keeping the house straightened up," i.e. housework. (R. at 298.) Dye claimed that his wife dealt with the household finances, but that he was able to manage his personal care and medications. (R. at 298.) Dye acknowledged that he mowed the yard, changed the oil on their vehicles and performed simple automotive repairs. (R. at 298.) Miller found that Dye's social skills were adequate, and that he related well during the evaluation. (R. at 298.) She further noted that he was a pleasant individual who communicated in a clear, coherent manner. (R. at 298.) Miller determined that, based upon Dye's intellectual functioning, he possessed the necessary judgment to manage his own financial affairs. (R. at 298.) In addition to other tests, Miller administered the Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), and, based upon Dye's full intelligence quotient, ("IQ"), score of 94, Milller determined that Dye was in the average range of intelligence, with an eighth grade reading level and a fifth

Case 2:07-cv-00034-GMW-PMS   Document 16   Filed 05/09/08   Page 19 of 33   Pageid#: 70

grade arithmetic level. (R. at 299.) Miller diagnosed Dye with depression, not otherwise specified, transient and mild. (R. at 299.) Lastly, Miller assessed Dye's Global Assessment of Functioning, ("GAF"), score at 75.[13] (R. at 300.)

Miller also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) form on May 17, 2006. (R. at 301-03.) Miller found no limitations in Dye's ability to understand, remember or carry out instructions. (R. at 301.) Likewise, Miller found that Dye was unlimited in his ability to respond appropriately to supervision, co-workers and work pressures in a work setting. (R. at 302.) Miller identified no other capabilities that would be limited by Dye's impairments, and she also noted that Dye was capable of individually managing his benefits in his best interests. (R. at 303.) Miller's findings were affirmed by Robert Spangler, Ed.D, in May 2006. (R. at 303.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the

---

[13]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.) A GAF score of 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors [and there is] no more than slight impairment in social, occupational, or school functioning." DSM at 32.

requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053) (4th Cir. 1980).

By decision dated September 18, 2006, the ALJ denied Dye's claims. (R. at 261-67.) The ALJ found that Dye met the disability insured status requirements of the Act for DIB purposes through December 31, 1999, but not thereafter. (R. at 266.) The ALJ found that Dye had not engaged in substantial gainful activity since June 28, 1998. (R. at 266.) In addition, the ALJ determined that Dye had combined impairments that were severe, but he found that Dye did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 266.) Furthermore, the ALJ found that Dye's allegations of disabling pain and other symptoms were credible, as they related to the

period beginning February 4, 2003, but not prior to that date. (R. at 266.) The ALJ determined that, at all times relevant to his decision, Dye possessed the residual functional capacity to perform light work that did not require overhead reaching or work at unprotected heights and around dangerous machinery. (R. at 266.) The ALJ also determined that Dye was limited to simple, unskilled jobs. (R. at 266.) Therefore, the ALJ found that Dye was not capable of performing his past relevant work as a general laborer in the coal mines. (R. at 266.) Moreover, the ALJ found that prior to February 4, 2003, Dye was classified as an individual closely approaching advanced age, and as of February 4, 2003, Dye attained the age of 55, which classified him as advanced age. (R. at 266.) The ALJ noted that Dye had a limited education, and that he did not possess any acquired work skills that were transferrable to the skilled or semiskilled work activities of other work. (R. at 266.) The ALJ concluded that, considering Dye's residual functional capacity, age, education and work experience, he was not disabled prior to February 4, 2003, and that there were jobs within the regional and national economies that Dye was capable of performing prior to February 4, 2003, such as a general laborer, a hand packer, a sorter, an assembler and a food service worker. (R. at 267.) Additionally, the ALJ found that, considering Dye's residual functional capacity, age, education and work experience, he was disabled as of February 4, 2003. (R. at 267.) Thus, the ALJ concluded that Dye has been under a disability as defined in the Act since February 4, 2003, but not prior thereto. (R. at 267.)

Dye argues that the ALJ's findings were not supported by substantial evidence. (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 7.) Specifically, Dye first argues that the ALJ failed to accord proper weight to the

opinion of Dr. Walker, Dye's treating physician. (Plaintiff's Brief at 7-8.) Secondly, Dye contends that the ALJ erred in the evaluation of Dye's non-exertional limitations. (Plaintiff's Brief at 9-10.) Thirdly, Dye argues that the ALJ erred in the consideration of Dye's mental limitations. (Plaintiff's Brief at 10-12.) Lastly, Dye argues that the ALJ failed to pose a hypothetical question that was consistent with the ALJ's residual functional capacity finding. (Plaintiff's Brief at 12.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his

-23-

findings.

Dye's first argument is that the ALJ failed to accord proper weight to the opinion of Dye's treating physician, Dr. Walker. (Plaintiff's Brief at 7-8.) I disagree. In general, the ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)(2007). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[14] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

This precise argument was addressed by this court in its previous March 22, 2006, decision regarding Dye's claims. Dr. Walker, Dye's treating physician,

---

[14]*Hunter* was superseded by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

completed Medical Assessment Of Ability To Do Work-Related Activities (Physical) forms on July 15, 2002, and on December 15, 2003, in which he reported identical findings. (R. at 149-51, 221-23.) Dr. Walker determined that Dye's ability to lift and/or carry items was affected by his impairments. (R. at 221.) Dr. Walker found that Dye could lift and/or carry items weighing up to five pounds occasionally, which was identified as "from very little up to 1/3 of an 8-hour day." (R. at 221.) In addition, Dr. Walker found that Dye was capable of lifting and/or carrying items weighing up to one pound frequently. (R. at 221.) Dr. Walker also determined that Dye could only stand and/or walk for a total of one hour in a typical eight-hour workday, and that he could only stand and/or walk for 10 minutes without interruption. (R. at 221.) Furthermore, Dr. Walker reported that Dye could sit for a total of two hours in an eight-hour workday, but that he could do so for only 15 minutes without interruption. (R. at 222.) Dr. Walker found that Dye could never climb, stoop, kneel, balance, crouch or crawl, and that his ability to reach, handle and push/pull were affected by his impairments. (R. at 222.) Dye's ability to feel, see, hear and speak were not impacted by his impairments. (R. at 222.) Dr. Walker noted no environmental limitations. (R. at 223.) Dr. Walker concluded that these limitations were supported by the medical findings related to Dye's arm and back pain. (R. at 221-23.)

However, despite these very strict findings, Dr. Walker's own notes are inconsistent with the above-mentioned limitations. In December 2001, Dr. Walker noted that Dye presented with "no symptoms whatsoever." (R. at 193.) Notably, during office visits in both 2001 and 2002, Dye made no complaints regarding his back or shoulder. (R. at 192-93.) After a June 2002 hospitalization, Dr. Walker

-25-

noted that Dye was "doing well." (R. at 192.) Similarly, in a June 2003 office visit, Dr. Walker again stated that Dye was doing well, and he noted that Dye presented with no significant symptoms. (R. at 188.) As discussed in the court's March 2006 decision, in December 2003, the same month in which Dr. Walker completed one of the functional assessment forms that cited several strict limitations, during an office visit, Dr. Walker noted that Dye was "doing well" and that he had "no complaints." (R. at 147.) Moreover, Dr. Walker's examination during this particular office visit was entirely unremarkable. (R. at 147.) Following the same pattern, in June 2004, Dr. Walker's notes indicate that Dye reported no complaints and that Dye was "doing well." (R. at 310.) In addition, Dr. Walker's notes lack any objective medical findings; instead, the notes simply reference Dye's subjective complaints of pain.

Furthermore, Dr. Walker's assessments appear to be even more questionable when Dye's statements as to his daily activities are considered. Dye has consistently maintained that he can perform tasks such as mowing, vacuuming, grocery shopping, laundry, changing the oil on his vehicles, simple repairs and other household activities. (R. at 298, 330.) In May 2006, in addition to the activities already mentioned, Dye indicated that he assisted his wife in caring for their infant granddaughter. (R. at 298.) The performance of such tasks calls into question Dr. Walker's strict restrictions on Dye's abilities. Additionally, the record is devoid of any other assessments or medical findings that restrict the claimant to the extent stated in Dr. Walker's findings. Accordingly, I am of the opinion that the ALJ did not err in rejecting the opinion of Dr. Walker. Dr. Walker's opinions were not supported by the evidence of record, as they were inconsistent with other substantial evidence; therefore, the ALJ did not err by according the opinion significantly less weight.

*Craig*, 76 F.3d at 590.

Dye also argues that the ALJ erred by not properly evaluating his non-exertional limitations. (Plaintiff's Brief at 9-10.) Dye contends that the ALJ ignored the limitations noted by Dr. Yousuf, as well as the limitations noted by the state agency physicians, and that he failed to include those limitations in his residual functional capacity finding. (Plaintiff's Brief at 9-10.)

In determining whether substantial evidence supports the Commissioner's decision, it is incumbent upon the court to consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. In this case, the ALJ specifically referenced and discussed the findings of Dr. Yousuf and the state agency physicians. (R. at 263-64.) In particular, the ALJ pointed out the limitations reported by Dr. Yousuf, such as limited range of motion in the left shoulder and slight decrease in motor strength of the left upper extremity associated with mild atrophy and decreased grip; however, the ALJ noted that these limitations were not reported in the treating physician's notes, and that Dr. Yousuf's findings were inconsistent with Dye's own statements as to his actual daily activities. (R. at 263.) The state agency physicians determined that Dye was limited to work at the medium exertional level, limited in his ability to reach in all directions with his left arm, limited to only occasional stooping and that he could never climb ladders. (R. at 108-09.) It is apparent from the ALJ's opinion that he did not ignore the findings of Dr. Yousuf or the state agency physicians. In fact, as stated in the ALJ's opinion, despite the findings by the state agency physicians that Dye was capable of

Case 2:07-cv-00034-GMW-PMS   Document 16   Filed 05/09/08   Page 27 of 33   Pageid#: 78

performing medium work, the ALJ stated that Dye was "given every benefit of the doubt," as he concluded that Dye was limited to work at the light exertional level.[15] (R. at 264.) The ALJ also concluded that Dye could not perform jobs that required overhead reaching or work at unprotected heights. (R. at 266.) In my review of the relevant evidence, I am of the opinion that, although the ALJ may not have adopted each of the non-exertional limitations or restrictions noted by Dr. Yousuf and the state agency physicians, the ALJ did properly consider those findings and that he sufficiently analyzed all relevant evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40.

Dye also argues that the ALJ erred in the consideration of his mental limitations. (Plaintiff's Brief at 10-12.) In the ALJ's opinion, he recognized that the primary reason for remand was to evaluate Dye's complaints of insomnia and depression, which this court determined had not been properly addressed in the previous ALJ's decision. (R. at 263.) Dye points out that the ALJ stated that "[t]here is no credible evidence whatsoever that the claimant has a severe impairment or that he has a severe sleeping problem." (R. at 263.) However, within the same opinion, the ALJ found that Dye suffered from mild, untreated depression, which he identified as a severe impairment. (R. at 264.) Then, later in the opinion, the ALJ noted that Dye did not have a "documented severe mental impairment at any time pertinent" to the decision. (R. at 265.) Thus, Dye argues that the ALJ's findings are conflicted

---

[15]As noted by the Commissioner on brief, Social Security Ruling 85-15 states that light work remains intact for a person who is limited to occasional stooping; thus, by finding that Dye was limited to work within the light range, this limitation was properly accounted for in the ALJ's residual functional capacity finding. Social Security Ruling (SSR), 85-15, 1985 LEXIS 20, *18.

-28-

because, at certain points in the opinion, the ALJ stated that Dye did not suffer from a severe mental impairment, but nonetheless concluded that Dye's mild untreated depression was severe. Dye claims that, since the ALJ noted no limitations regarding mild, untreated depression, the ALJ's residual functional capacity finding is not supported by substantial evidence. (Plaintiff's Brief at 11.)

The court recognizes the inconsistency in the language used by the ALJ. As noted by Dye, in general, a severe impairment is defined as any impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities. *See Luckey v. U.S. Dept. of Health & Human Servs.*, 890 F.3d 666, 669 (4th Cir. 1989) (per curiam); 20 C.F.R. §§ 404.1520(c), 416.920(c) (2007). Irregardless of the language employed by the ALJ, the court is of the opinion that the ALJ accounted for significant restrictions regarding Dye's alleged mental limitations. In a consultative examination, Miller diagnosed Dye with depression not otherwise specified, transient and mild, and assessed him with a GAF of 75, which is defined as no more than a slight impairment in social, occupational or school functioning. (R. at 299-300.) Miller also concluded that Dye was not limited in his ability to understand, remember or carry out short, simple or detailed instructions, in his ability to make judgments on simple, work-related decisions and not limited in his ability to respond appropriately to supervision, co-workers and work pressures in a work setting. (R. at 301-02.) Despite findings that suggested that Dye was capable of responding appropriately in work settings and carrying out short, simple *or* detailed instructions, the ALJ found that Dye was limited to only simple, unskilled jobs. (R. at 266.) Unskilled work is defined as work "which needs little or no judgment to do simple duties that can be learned on the job

-29-

in a short period of time." *See* 20 C.F.R. §§ 404.1568(a), 416.968(a) (2007). Thus, by limiting Dye to simple, unskilled jobs, I am of the opinion that the ALJ properly accounted for any mental limitations in his residual functional capacity finding.

As stated above, this court's previous ruling remanded the case to the Commissioner for further consideration of Dye's potential non-exertional limitations of depression and insomnia. The prior ALJ's opinion failed to address these potential limitations; however, in this case, the ALJ specifically referenced Dye's complaints of depression and insomnia. (R. at 263.) The ALJ determined that there was no credible evidence to show that Dye suffered from severe sleeping problems. (R. at 263.) Although there are several instances within the record to show that Dye complained of insomnia, (R. at 101, 297. 299, 328), there is nothing within the record to indicate that this complaint is severe, or that it would cause Dye to be limited in his ability to perform work activities. Moreover, Dye's complaints simply amount to subjective allegations, with no substantive medical findings or diagnoses to support them. Therefore, there is substantial evidence within the record to justify the ALJ's determination that Dye does not suffer from a severe sleeping problem. Accordingly, I am of the opinion that the ALJ properly considered this alleged non-exertional limitation.

Lastly, Dye argues that the ALJ failed to pose a proper hypothetical question to the vocational expert. (Plaintiff's Brief at 13.) Specifically, Dye argues that the ALJ's hypothetical question did not contain all limitations as set forth in the residual functional capacity finding, i.e. that Dye could not perform work at unprotected heights. (Plaintiff's Brief at 12.) Testimony of a vocational expert constitutes

substantial evidence for purposes of judicial review where his opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two issues: 1) whether the ALJ's finding as to the claimant's residual functional capacity is supported by substantial evidence; and 2) whether the hypothetical adequately set forth the residual functional capacity as found by the ALJ. The Commissioner may not rely upon the answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

In the second hypothetical the ALJ posed to the vocational expert, he specifically asked her to "assume a person of the same age, education and prior work" as the claimant, who "would be restricted to light work activity . . . with no overhead reaching and [the] ability to do only simple, unskilled jobs [that] that would not require him to work around dangerous equipment or machinery[.]" (R. at 335-36.) In response to that question, the vocational expert opined that there would be jobs available within the regional and national economies that a person with the previously mentioned limitations could perform, such as a general laborer, a hand packager, a sorter, an assembler and as a worker in the food service industry. (R. at 336.) The ALJ concluded that Dye possessed the residual functional capacity to perform light work that did not require overhead reaching or work at unprotected heights and around dangerous machinery. (R. at 266.) In addition, the ALJ found that Dye was limited to simple, unskilled jobs. (R. at 266.) Therefore, because the ALJ failed to include the unprotected heights limitation in the hypothetical, he essentially posed a

-31-

hypothetical question that did not adequately reflect his own residual functional capacity finding. The inclusion of this restriction could have resulted in fewer jobs being available within the regional and national economies; thus, impacting the testimony of the vocational expert. The court is aware that this oversight by the ALJ would likely not have led to a determination of disability; however, the Commissioner is not permitted to rely on an answer to a hypothetical when that hypothetical fails to fit the facts. *See Swaim*, 599 F.2d at 1312.

Thus, because I find that the ALJ did not pose a hypothetical to the vocational expert that accurately set forth the ALJ's finding as to Dye's residual functional capacity, the vocational expert's testimony cannot constitute substantial evidence upon which the ALJ may rely in determining Dye's residual functional capacity and ability to work.

## IV. Conclusion

For the foregoing reasons, I will deny the Commissioner's motion for summary judgment. The Commissioner's decision denying benefits will be vacated, and the case will be remanded to the ALJ for further consideration of Dye's residual functional capacity and ability to work.

An appropriate order will be entered.

DATED:     This _9th_ day of May, 2008.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

-33-